Filed 6/29/22  P. v. Herrera CA2/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESSE HERRERA,<br><br>Defendant and Appellant. | B298686<br><br>(Los Angeles County<br>Super. Ct. No. VA140013) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Cowell, Judge.  Affirmed with directions.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Julie Harris, Shezad H. Thakor and Gary A.

Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jesse Herrera (defendant) appealed from the judgment entered after he was convicted of attempted willful, deliberate, and premeditated murder; attempted voluntary manslaughter; and shooting at an inhabited building; with true findings on firearm and other special allegations. He asserted that the use of a defective verdict form for the attempted murder count required reversal and that he received ineffective assistance of counsel due to his counsel's failure to both object to the verdict form and to request jury instruction CALJIC No. 3.32. Defendant also asserted that the firearm enhancement alleged as to count 3, shooting at an inhabited building, should have been stricken, and he requested remand to the trial court to consider a lesser enhancement. Defendant's final contention concerned several errors in the abstracts of judgment.

In our original opinion filed October 7, 2020, we rejected defendant's contentions regarding the verdict form, as well as his claim of ineffective assistance of counsel. We found that though the trial court struck the firearm enhancement in count 3, the order was incorrectly recorded in the abstract of judgment, and we ordered amended abstracts. We rejected defendant's contention that the trial court's discretion to strike a firearm enhancement included the authority to substitute a lesser, uncharged firearm enhancement, but we agreed that the errors in the abstract of judgment should be corrected. We otherwise affirmed the judgment.

The California Supreme Court granted review and on April 27, 2022, returned the matter to this court with directions

2

to reconsider the cause in light of *People v. Tirado* (2022) 12 Cal.5th 688. We hereby vacate our prior decision and issue this opinion in its place.

## BACKGROUND

Defendant was charged in counts 1 and 2 of an amended information with attempted murder in violation of Penal Code sections 664 and 187, subdivision (a).[1] It was also alleged that the attempted murders were committed willfully, deliberately, and with premeditation and that defendant personally and intentionally discharged a handgun within the meaning of section 12022.53, subdivision (c). Count 3 alleged that defendant unlawfully fired a firearm at an inhabited dwelling in violation of section 246, and in count 4 defendant was charged with second degree robbery in violation of section 213, subdivision (b). It was also alleged that defendant personally and intentionally discharged a firearm causing great bodily injury to Jose Romero (Romero), within the meaning of section 12022.53, subdivision (d). As to counts 1, 3, and 4, it was separately alleged that defendant personally caused great bodily injury to Romero, within the meaning of section 12022.7, subdivision (a). Finally, it was alleged pursuant to section 186.22, subdivision (b) that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

3

A jury found defendant guilty of the attempted willful, deliberate, and premeditated murder of Romero and found true the firearm and great bodily injury allegations under sections 12022.53, subdivision (d) and 12022.7, subdivision (a). The jury also found defendant guilty of the lesser offense of the attempted voluntary manslaughter of Miguel Romero (Miguel)[2] and found true that he used a firearm within the meaning of section 12022.5, subdivision (a). In count 3 defendant was found guilty, and the firearm allegation was found to be true. Defendant was found not guilty of count 4, and the gang allegations were found not true.

On May 22, 2019, the trial court sentenced defendant on count 1 to life in prison plus 25 years to life for the firearm enhancement.[3] The court imposed and stayed the middle term of three years and the firearm enhancement on count 2 pursuant to section 654. Defendant was sentenced on count 3 to the high term of seven years in prison and the firearm enhancement was stricken.

Defendant filed a timely notice of appeal from the judgment.

---

[2]     To avoid confusion, we will refer to Miguel Romero by his first name only. We mean no disrespect.

[3]     The indeterminate abstract of judgment erroneously recorded the life sentence in count 1 as life without parole. In addition, since the jury found the gang allegation not true, the entry on the abstract that defendant was sentenced pursuant to section 186.22, subdivision (b)(5) was also an error. As we vacate the judgment in this opinion, the court will have the opportunity to prepare a new abstract.

4

**Prosecution evidence**

  *Gang evidence*[4]

  Los Angeles County Sheriff's Department Detective Guillermo Sanchez testified as the prosecution's gang expert. He was familiar with the Florencia 13 gang, also called Florencia Treces, which he described as a violent criminal street gang operating in a large area of Los Angeles County known as the Florence/Firestone district. The borders of their claimed territory include East 55th Street to the north and East 97th Street to the south. The crimes commonly committed by members of the gang are assaults and gang-related graffiti. Graffiti is placed throughout the gang territory to show it is the gang's territory. When a gang member asks, "Where are you from?" it is meant as a challenge or to intimidate persons within their territory. Calling out one's gang's name or saying, "This is Florencia Treces," often precedes an assault.

  Detective Sanchez testified to his opinion that defendant was a member of the Florencia 13 gang. He based his opinion on information he obtained by speaking to other investigators and to informants who knew defendant, as well as photographs of defendant displaying hand signs signifying his membership in the gang. Detective Sanchez spoke to another sheriff's department gang detective, Armando Arevalo, about defendant. Detective Arevalo testified that in 2009, he and his partner had engaged defendant in conversation, including defendant's admission that he was a member of the Florencia 13 gang.

---

[4] As the jury found the gang allegation not true, we summarize only the gang testimony which is helpful to understanding the other witnesses' testimony.

Detective Arevalo noticed at trial that defendant looked older and larger than he had in 2009.

### Romero's testimony

On April 26, 2015, sometime before 11:00 p.m., Romero parked his car on 70th Street near his Compton Avenue home. He got out of his car carrying his computer and other belongings, and as he walked he was approached by a young man he did not recognize. The unknown man said, "This is my territory. This is Florencia 13. And who are you?" The man also asked whether Romero belonged to any gang, or if he was *Paisa*, meaning a Mexican who does not speak English. Romero, 40 years old at the time, was not a gang member and told that to the man. As Romero continued to walk, the man took his hat, asked for his watch, and tried to grab Romero's wallet from his pocket. The man said he wanted the computer or the wallet and threatened to "kick his ass." When Romero refused and continued walking, the man hit him from behind. Romero put his computer down and resisted by pushing but not hitting him. Romero then ran, and as he turned onto Compton Avenue, the man loudly yelled, "We're going to follow you where you live and we're going to kill you."

When Romero was on Compton Avenue, another man, whom he later identified as defendant, emerged from an apartment building with a third man. Defendant approached Romero and joined the initial assailant in punching Romero with closed fists, as the third man stood by. Romero testified that he had lived in the house just two doors down for about 20 years with no problem, and did not want to create any problems, so did

not fight back.[5]  As Romero reached the sidewalk outside his home, he yelled for Miguel to come outside.  Then defendant and another man threw Romero to the ground, where they stepped on his face and kicked him.  Romero heard them saying "Florencia 13" and "fucking faggots."  Romero, who was frightened, screamed.  Miguel came outside, yelled at the men, and one of them ran toward the apartment building defendant had come from.  Defendant continued to attack Romero until Miguel grabbed his arm, told him to stop and to let Romero go.  Defendant tried to hit Miguel, but then stopped and left.

Miguel helped Romero into their yard and closed the gate.  Before Miguel could take Romero to the hospital, defendant and the other man came back; it had been about a minute.  They said, "This is Florencia Treces, faggots.  You're going to die."  Romero, who was then on his knees, stood and picked up an aluminum tube from the ground to defend himself.  As he held the tube at his side, Romero saw that defendant had a gun.  Realizing that the tube would be useless, Romero dropped it.  The first assailant yelled, "Kill him.  Kill that fucking faggot," and told defendant to shoot him.  As he let go of the tube, defendant shot Romero in the chin, breaking his jaw and knocking him to the ground.  As Romero began to crawl away, he saw defendant fire the gun in the direction of where Miguel was hiding on the porch behind a pillar.  Romero then started running toward the back yard.  He heard four or five gunshots before he saw defendant run away.

Romero testified that in the year before the shooting, he had seen defendant in the neighborhood maybe 15 to 20 times

---

[5]     Romero and Miguel lived in a small house behind a larger house on property owned by Romero's uncles.

and recognized him as a neighbor.  Romero kept his distance from defendant because Romero and his family were not gang members, and they had no problems with defendant.

After the shooting Romero spent more than a week in the hospital.  His jaw was surgically repaired and then over time he had more surgeries.  A metal plate was inserted and in place for about six months, requiring Romero to live on a liquid diet.  Two years later, he could eat only soft foods and had not recovered sensation in parts of his jaw.  Romero was out of work for almost two years and continued to have nightmares, sleepwalking episodes, and disturbing memories of the incident.  Romero's family was afraid and moved far away.

### Miguel's testimony

Miguel was awakened by his girlfriend, Maria Bramasco, around 11:00 that night, telling him that someone was beating up his brother.  He ran outside where he saw two men hitting and kicking Romero, who was on the ground just outside the gate.  As they kicked him, the two men were saying "faggot" and "Florencia Treces."  As Miguel ran outside, one of the men ran off.  Miguel identified the man who remained as defendant.  Defendant continued to kick Romero until Miguel grabbed defendant's arm and pulled him off his brother for about five seconds, which gave Romero the chance to get up.  Defendant then ran to the nearby yellow apartment building where Miguel had previously seen him on occasion.

Miguel brought his brother into their yard and saw that Romero's eyebrow was split, his nose was swollen, and was bleeding from his nose and his mouth.  Romero also had a lot of marks on his chest.  About one minute later, defendant returned with the other man who had been hitting Romero.  Defendant

seemed angry and shouted "faggots" and "Florencia Treces" and a lot of "bad words." Romero picked up a garden post or stake, which he held down by his side for about five seconds. Romero dropped it when defendant was about three or four feet away from him. Defendant then shot Romero in the face about a second after Romero dropped the stake. Miguel ran to a porch pillar for cover as defendant said that he was Florencia Treces and was going to kill him. Defendant then fired the gun four times in Miguel's direction. Defendant walked back and forth on the sidewalk as he fired, causing Miguel to have to match movements so as not to be in his line of fire. Bullets from defendant's gun struck the pillar and the walls of the house. Defendant and the other man then ran back toward the apartment building. Miguel's girlfriend called 911.

Miguel was 43 years old at time of trial, was not a gang member and had never had any prior conflict with the Florencia 13 gang or with defendant. Miguel's girlfriend's brother was a Florencia 13 gang member. After the shooting, afraid of the gang, Miguel and his family moved away, and Miguel had to change to a job in the new area.

**Defense Evidence**

The defense called psychologist Kevin Booker, who testified as an expert in posttraumatic stress disorder (PTSD). Dr. Booker examined defendant, who reported that at the age of 17 he was shot and significantly wounded while with another person who was shot and killed. After defendant took some diagnostic tests, Dr. Booker diagnosed defendant with chronic, fairly severe PTSD. Dr. Booker also diagnosed defendant with a mood disorder consistent with clinical depression, but not necessarily

9

rising to that level. Dr. Booker found that defendant suffers from hypervigilance, which is a core characteristic of PTSD.

Dr. Booker explained that exposures to violence that cause significant psychological trauma can affect a person's ability to perceive whether or not certain situations or environments are actually dangerous or threatening. Such people sometimes experience daydreams that are reflective of flashbacks of the actual traumatic event, causing them to think they are actually back in the traumatic event. They become hypervigilant and avoid situations that will remind them of the traumatic event. When faced with a situation perceived as threatening, such a person may overreact impulsively with an excessive "automatic response." Some PTSD sufferers may experience a fight-or-flight response, which can include freezing or fainting. Some individuals with PTSD can experience a flight and fright response simultaneously.

Defendant testified that in April 2015, he was 21 years old and had lived in the yellow apartment building on Compton Avenue with his two daughters and their mother, Maria Gaspar, for about four or five months. He had never had any problems with his neighbors and had not seen Romero or Miguel before the night of the shooting although they lived two houses away.

That night defendant's family had a barbeque. At trial defendant claimed that it was to celebrate his younger sister's birthday (a date he could not recall), although he had told a detective that it was a celebration for his brother who had just been released from jail. Defendant's brother, Jose Luis Herrera (Jose Luis), who lived down the street, was there with his girlfriend Jasmin and their children, as were Gaspar, defendant's

10

two daughters, defendant's mother and her boyfriend, and defendant's sister.

Jose Luis and Jasmin left around 10:30 or 11:00 p.m., and five or 10 minutes later, as defendant was cleaning up, he heard Jasmin scream out his name, saying, "Jesse, they are jumping your brother." Defendant, his mother, and her boyfriend ran to the front, where defendant saw Romero and Jose Luis punching each other while Miguel was saying, "Kick his ass for being stupid." Defendant approached and tried pulling Romero away from Jose Luis, by bearhugging him. Defendant did not recognize Romero and denied seeing a computer. Romero asked defendant, "Do you want to pay for him also?" Then Romero began fighting with defendant. As they fought, Romero said, "If you don't pay for it today you're going to pay for it later, because I know where you live," which defendant took as a threat. During cross-examination defendant denied that he punched or kicked Romero and surmised that Romero probably suffered injuries from fighting Jose Luis. Defendant testified that he punched Romero when Romero started fighting him, and denied ever saying he did not kick him in the head or that Romero had already suffered the injuries. Defendant explained that they punched each other, and that defendant probably did punch Romero in the face, but he could not remember.

Defendant also testified that he heard Romero say to Miguel, "Go call Beto and tell him to get that shit," which defendant interpreted as getting a gun. Defendant explained that Beto lived in the building where Romero and Miguel lived. Defendant had first seen Beto in the alley, two or three months after defendant moved there. Beto, who had "Florence" tattooed across his chest, asked him, "Where you from?" Defendant

11

responded that he was not from around there, but grew up there. While they talked, Beto kept his hand in his pocket, and defendant assumed he had a gun. Defendant denied being a gang member and did not think that Romero was a gang member. He did not see Beto or a gun the night of the shooting. Defendant denied that he ever yelled out the words Florencia or faggots. He explained that "faggots" and "flowers" were terms used to insult Florencia 13 gang members and that no one would yell them in that neighborhood. Defendant explained that he grew up with a lot of Florencia 13 members and was a "claimer" but not an actual member.

After Romero told Miguel to get Beto, Miguel ran down the side walkway of his house. Defendant thought he was going to get a gun, so defendant stopped fighting with Romero and went to get a loaded gun he had hidden in a drain hole next to the front door of his apartment. Defendant explained that he retrieved the gun because his family was still outside, and he thought that Romero would see the gun, get scared and run away.[6] When he ran back toward the Romero residence, he saw Romero with a pole that looked like a big wooden stick, using it to beat Jose Luis. Without pointing the gun, but just holding it down at his side, defendant told Romero to "get the fuck out of here." Romero stopped hitting Jose Luis, began walking toward defendant, holding the pole in a threatening manner, and said, "What the fuck are you going to do with that?" Defendant then fired the gun two times without aiming. Frightened, because he had never fired a gun before, he instantly ran toward his

---

[6]     Defendant testified that his mother and her boyfriend witnessed the shooting. None of defendant's relatives or friends testified at trial.

12

apartment building.  Defendant did not think the bullets had hit Romero.  Defendant explained that he feared for his life just before he fired, because he thought Romero was going to hit him, which would make him drop the gun, and then Romero would get it and shoot him.

Defendant ran to his apartment, threw the gun inside, and then went two blocks to his mother-in-law's home.  The next morning, he went to his sister's nearby home where he stayed for a few days.  Defendant never returned to the apartment on Compton Avenue, because he claimed he was afraid of retribution.

Defendant did not own legally the .22-calibur revolver he used that night.  He felt he needed to protect himself and his family, because he had been the victim of violence and lived in a dangerous neighborhood.  He explained that in 2011, when he was 17, he and a friend had been shot, and his friend was killed.  The shooter was caught, and defendant was forced to testify in court, even though he claimed that he had been unable see the shooter and was afraid "they" would retaliate.  Defendant claimed that the shooting was not gang-related but concerned a girl.  Defendant has never received counseling or mental health treatment and denied any personality change after he was shot, although he was more aware of his surroundings, was wary of cars approaching, and once fireworks frightened him.

After his September 2015 arrest, defendant agreed to speak with a detective and denied having anything to do with the shooting.  He also told the detective that he did not even live in that neighborhood as he lived with his sister.  Defendant also denied that he was a member of the Florencia 13 gang.

13

The parties stipulated that the incident report written by Sheriff's Deputies Johnson and Macias included a statement that Miguel and Romero said they had been standing on the west curb in front of their residence and were approached by the suspects. The report included that Romero had a verbal dispute with one of them, and when the other suspect approached, he placed the tip of the barrel of a small handgun on Romero's right cheek while facing him and fired one shot.

**Rebuttal evidence**

Deputy Andrew Morrell testified that on April 16, 2011, while on routine patrol duty with a partner late at night and early the next morning, he encountered defendant with several Florencia 13 gang members. His partner advised them to get off the streets for their own safety. An hour or two later, the deputies responded to a "shots fired" call about two or three blocks from where they had spoken to defendant. They found two gunshot victims, defendant and one of his companions, who later died.

Bramasco testified that she and Miguel were asleep in her home at 11:00 the night of the shooting. No one else lived there with her, although her brother Alberto had lived with her before the shooting and has lived with her since then. Alberto had been known by his nickname "Beto" since childhood and had been a member of the Florencia 13 gang in the past. Bramasco denied being a member of the Florencia 13 gang and testified that Romero and Miguel were not gang members. Alberto would hang out in the back house sometimes, but did not hang out in the alley. Alberto lived and worked in Las Vegas and was in Las Vegas at the time of the shooting. On the night of the shooting, Bramasco woke to the sound of someone calling Miguel's name.

14

She looked out the window, saw two men beating and kicking Romero, and woke up Miguel. She told Miguel that she saw two men fighting with his brother, kicking and hitting him while he was on the ground covering his face. When Miguel went outside, she stayed in the house, so she was unable to identify either man. She did not see Romero kick or punch anyone.

Detective Sanchez testified that gangs keep "hood guns" that can be shared by several gang members in the same neighborhood and are usually kept in a place that is accessible to all of them. Gang members do this in order not to be caught with a gun on them or in their homes. In this case, the location of defendant's gun was consistent with it being a hood gun. He added that "Flower" is a disrespectful name for Florencia used by rival gang members; "faggot" is disrespectful, but not especially gang-related. When Detective Sanchez attempted to interview defendant on the day of his arrest, he denied any knowledge of the shooting, saying he did not live there and was not there on the day of the shooting. Defendant claimed that he had no friends who were Florencia 13 gang members. When Detective Sanchez tried to get defendant to talk about what happened, defendant repeated that he was not there: "I wasn't there. That's it." Defendant also claimed that he had never heard of the shooting and that he did not even know anyone there.

## DISCUSSION

### I.  Verdict Form

Defendant contends the jury's finding that the count 1 attempted murder was willful, deliberate, and premeditated must be reversed because the verdict form did not provide a separate finding to be made only after the jury found defendant guilty of

15

attempted murder.  Defendant complains that the verdict form failed to afford the jurors an opportunity to convict him of attempted murder without a finding of premeditation and deliberation.  The People counter that defendant has forfeited the issue and that it fails on the merits, as defendant has not shown prejudicial error.  We agree with the People.

> The guilty verdict form for count 1 read in relevant part: "We, the Jury in the above-entitled matter, find the defendant, Jesse Herrera, guilty of the crime of attempted willful, deliberate, and premeditated murder, of Jose Romero, in violation of Penal Code Section 664/187(A), a felony, as charged in Count 1 of the Amended Information."

Not only did defendant fail to object to the verdict form, defense counsel expressly approved of all verdict forms proposed by the court and later expressly declined the trial court's offer to poll the jury.  Defendant argues that there has been no forfeiture of the issue because only Courts of Appeal have held that the failure to challenge verdict forms in the trial court results in forfeiture, yet defendant cites to a California Supreme Court case for this assertion.  (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. 6, overruled on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)  Our Supreme Court held in *People v. Toro* that to preserve a challenge on appeal to a verdict form, there must be objection to it.  The court has so held in other cases as well; there must be an objection either at the time the trial court proposes the form or when the verdict is returned, or there must be a request for clarification of the verdict when the jury is polled.  (*People v. Johnson* (2015) 61 Cal.4th 734, 784, citing *People v. Jones* (2003) 29 Cal.4th 1229, 1259, and *People v. Bolin* (1998) 18 Cal.4th 297, 330.)

16

Defendant also argues that the failure of the court "to provide full and complete verdict forms to the jurors" affected his substantial rights and asks that we exercise our discretion to reach the issue, as he contends the California Supreme Court did in *People v. Osband* (1996) 13 Cal.4th 622, 689-690. There, the court did "not address . . . the question whether the court has any duty to provide the jury with verdict forms"; and the court held that any such failure in that case was harmless. (*Ibid.*) The court explained that if it is error at all, it is not reversible error for a trial court to fail to supply a specific verdict form where the jury has been properly instructed; and "[w]hen 'the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if [the jurors'] conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict.'" (*Ibid.*, quoting *People v. Hill* (1897) 116 Cal. 562, 570.)

Here, the jury was thoroughly instructed on the elements of attempted murder and the evidence the jury must find to support a conviction of attempted murder. The trial court *then* instructed: "It is also alleged in counts 1 and 2 that the crime attempted was willful, deliberate, and premeditated murder. *If* you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true." (Italics added.) The court then provided definitions of the terms willful, deliberate, and premeditated, and the following instruction:

> "*If* you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden

17

> heat of passion or other condition precluding the idea
> of deliberation, it is it is [*sic*] attempt to commit
> willful, deliberate, and premeditated murder."
> (Italics added.)

The court went on to explain the sort of evidence that was required to support a finding of premeditation and deliberation and that the prosecution was required to prove it beyond a reasonable doubt.[7]

 The trial court then stated: "Include a special finding on this question in your verdict, using a form that will be supplied for that purpose." The verdict forms provided for separate findings on other special allegations, but not premeditation and deliberation. If the jury had been confused, or their findings called for a form of verdict with which they were not furnished, they would have asked for the form or further instruction, as one of the trial court's final instructions was as follows: "During deliberations, any question or request you may have should be addressed to the court on a form that will be provided." The jury was indeed provided with such forms, as one was used to request testimony readback.

 The jury was provided with a not guilty verdict form in the following language:

> "We, the Jury in the above-entitled matter, find the
> defendant, Jesse Herrera, not guilty of the crime of
> attempted willful, deliberate, and premeditated
> murder, of Jose Romero, in violation of Penal Code

---

[7] The prosecutor also thoroughly went over the instructions for attempted murder and the special allegation and made clear that the jury was to determine premeditation and deliberation only after finding defendant guilty of attempted murder.

Section 664/187(A), a felony, as charged in Count 1 of the Amended Information."

Defendant complains that the two forms created an all-or-nothing choice that could have left the jury with the impression that premeditation and deliberation were elements of simple attempted murder.  Defendant's argument fails to show prejudicial error.  If the jury had found attempted murder but had not found that the attempted murder was willful, deliberate, and premeditated, the not guilty form would have called for an acquittal.  Thus, defendant could not have been disadvantaged by the all-or-nothing nature of the not guilty form, which is precisely why defendant's challenge to the verdict forms may not be raised for the first time on appeal:  "If we were to allow the issue to be raised for the first time on appeal, a party would have an incentive not to complain about the verdict form in the trial court in order to secure the advantage of seeking a complete reversal on appeal.  ([Citation] ['the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error'].)"  (*People v. Johnson, supra*, 61 Cal.4th at p. 784.)

Citing *People v. Breverman* (1998) 19 Cal.4th 142, defendant attempts to equate his all-or-nothing contention with a failure to *instruct* as to a lesser included offense.  However, the attempt fails, as there was no instructional error here, and jurors are presumed to have understood and followed the trial court's instructions, unless there is evidence of confusion or the jury requested further guidance on the issue.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)  As the jury was properly instructed and there was no request for a different form or for clarification,

19

it must be presumed that the verdict form was sufficient to reflect their finding that defendant committed attempted murder, which was premeditated and deliberated. (See *People v. Osband, supra*, 13 Cal.4th at pp. 689-690.)[8] Given the clear instructions regarding attempted murder and the special allegation, it is "unmistakenly clear" that the jury intended to convict defendant of attempted murder and to find true the special allegation that the attempted murder was willful, premeditated and deliberate; thus, defendant's """"substantial rights suffered no prejudice."""" (*People v. Johnson, supra*, 61 Cal.4th at p. 785, quoting *People v. Bolin, supra*, 18 Cal.4th at p. 331.)

## II.     Effective assistance of counsel

Defendant contends that trial counsel provided ineffective assistance by not requesting an instruction such as CALJIC No. 3.32[9] and by failing to object to the defective verdict forms.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-694 (*Strickland*).) It is the defendant's burden on appeal to demonstrate that trial counsel was inadequate and that prejudice resulted. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Prejudice is shown by "a reasonable probability that, but for counsel's

---

[8]     We decline defendant's invitation to disregard *People v. Osband* in favor of perceived dictum in *Stone v. Superior Court* (1982) 31 Cal.3d 503 and *People v. Aranda* (2019) 6 Cal.5th 1077, two cases regarding the procedure to be followed after the jury returns a partial verdict.

[9]     The trial court must give this instruction on request where it is supported by the evidence, but has no sua sponte duty to do so. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)[10] We presume that counsel's tactical decisions were reasonable, unless ""the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission."" (*Lucas*, at pp. 436-437.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

Before any requested modifications, CALJIC No. 3.32 reads:

> "You have received evidence regarding a [mental disease] [mental defect] [or] [mental disorder] of the defendant (insert name of defendant if more than one) at the time of the commission of the crime charged [namely, _____] [in Count[s] _____][.] [or a lesser crime thereto, namely _____]. You should consider this evidence solely for the purpose of determining whether the defendant (insert name of defendant if more than one) actually formed [the required specific intent,] [premeditated, deliberated] [or] [harbored malice aforethought] which is an element of the crime charged [in Count[s] _____], namely, _____[.] [or the lesser crime[s] of _____]."

---

[10]  As we concluded above, although the two verdict forms regarding count 1 were technically inaccurate, defendant failed to show prejudicial error. As defendant was not prejudiced by the verdict forms, this basis for claiming ineffective assistance of counsel fails. (*Strickland, supra*, 466 U.S. at p. 687; *People v. Holt* (1997) 15 Cal.4th 619, 703.)

Defendant argues that the instruction was supported by Dr. Booker's testimony, combined with defendant's testimony that he retrieved the gun only to frighten Romero and that he fired his gun "reflexively" when Romero threatened him with what defendant thought was a big wooden stick. Dr. Booker testified that defendant suffered from severe PTSD, including hypervigilance, which can cause the sufferer to misinterpret situations or environments as dangerous or threatening when they are not and to overreact impulsively. However, defendant did not testify that he fired *reflexively*, but rather, that he fired because he thought that his life was in danger. Indeed, defendant described his rather detailed thought processes prior to deciding to fire his weapon. Defendant testified that he thought Miguel was going to get a gun from Beto, and because defendant's family was still outside, he stopped fighting with Romero, went to his apartment building, and retrieved a loaded gun that he had hidden in a drain hole next to his front door. Defendant claimed that he did not intend to shoot Romero or Miguel and hoped to just scare Romero away, but when he ran back to the Romero residence, he saw Romero beating Jose Luis with a pole that looked like a big wooden stick to him. Defendant claimed he did not point the gun until Romero stopped hitting Jose Luis and began walking toward defendant, holding the pole up in a threatening manner, saying, "What the fuck are you going to do with that?" Defendant was afraid that Romero would hit him, causing him to drop the gun and that Romero would then pick it up and shoot him; so fearing for his life, he fired the gun two times *without aiming*. If defendant's description of Romero's actions was truthful, he may not have overestimated the danger. Moreover, he may not have aimed, but his testimony does not

22

indicate that he fired reflexively, without thinking. It was *after* he fired the gun two times that he then panicked, ran to his apartment, and threw the gun inside.

Given defendant's testimony, we agree with the People that defense counsel could reasonably have considered the instruction unnecessary in light of other instructions given, including CALJIC No. 8.67, which the trial court read as follows:

> "If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion *or other condition* precluding the idea of deliberation, it is it is [*sic*] attempt to commit willful, deliberate, and premeditated murder." (Italics added.)

The trial court also instructed the jury with several instructions on lawful self-defense and defense of others, including the following:

> "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an actual belief and fear that he's about to suffer bodily injury, and if a person in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent."

As CALJIC No. 3.32 is a *limiting* instruction, defense counsel might not have wanted it to distract the jury from her argument that defendant acted in lawful self-defense or defense of others—

that he reasonably perceived from Miguel's and Romero's actions a life-threatening danger to himself and his family. Such an argument comports with defendant's testimony, and defense counsel spent more time arguing lawful self-defense than any PTSD induced imaginative thinking or impulsive overreaction.

In sum, defendant has not persuaded us that the record affirmatively discloses that counsel had no rational tactical purpose for omitting a request for CALJIC No. 3.32. Nor has defendant met his burden to demonstrate the reasonable probability of a different result absent the limitation of the PTSD evidence to intent to kill, premeditation, and deliberation. Defendant argues that there was a reasonable chance of a better result if the jurors had been "specifically instructed through CALJIC No. 3.32, that they could affirmatively consider the PTSD evidence in relationship to the premeditation and deliberation factor." Defendant also argues that the instruction would have highlighted the foundation of his defense theory, and then he merely concludes that under the totality of the facts of this case, he would have enjoyed a better result if the jurors had been "specifically instructed on that element of the defense."

CALJIC No. 3.32 does not tell the jury that it could "affirmatively consider the PTSD evidence"; it tells the jury that it may consider the evidence *only* in determining intent, premeditation and deliberation. Nor does it explain the relationship of the PTSD evidence to defendant's defense of the premeditation and deliberation allegation, as the instruction merely limits any consideration of the evidence of a mental disorder to intent, premeditation and deliberation. Nor did the absence of the instruction leave the jury without a definition of premeditation and deliberation or a misunderstanding of the

24

evidence the prosecution was required to prove, as we explained in part I of our Discussion.

Defendant concludes that prejudice caused by the absence of the instruction was exacerbated by the prejudicial effect of the defective verdict forms. We reject defendant's conclusion, as we have determined that the verdict forms were not prejudicial.

In sum, defendant has failed to show that defense counsel had no rational tactical purpose, that there could be no satisfactory explanation for not requesting CALJIC No. 3.32, or that the absence of the instruction caused him prejudice. Defendant's claim of ineffective assistance of counsel thus fails.

## III.    Firearm enhancement (count 3)

Defendant contends that the trial court should have stricken as unauthorized, the firearm enhancement imposed in count 3, a violation of section 246, shooting at an inhabited dwelling. As discussed in parts IV, V, and VI below, we vacate defendant's sentence in its entirety and discuss this issue only to clarify the record.

The jury found the allegation that the defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c) to be true. Section 12022.53, subdivision (c) creates an enhancement for the commission of a felony specified in subdivision (a) of section 12022.53, but that subdivision does not list section 246. It is subdivision (d) of section 12022.53 that creates an enhancement to a conviction under section 246 where the personal and intentional discharge proximately causes great bodily injury or death. Although the amended information in this case alleged the firearm enhancement under section 12022.53, subdivisions (c) and (d) as to counts 1 through 4, the prosecutor stated at the instruction

25

conference (albeit not very clearly) that subdivision (d) should be alleged only as to counts 1 and 4, and that as to count 3, only subdivision (c) should be alleged.  The jury instruction regarding the section 12022.53, subdivision (d) allegation was then modified to refer only to counts 1 and 4.  The verdict form for count 3 included a space for finding true or not true the allegation that defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), but the form did not include a great bodily injury allegation.

The People agree that the enhancement is not authorized but asserts that defendant is mistaken in his position that the trial court did not strike it.  The court did strike the enhancement and defendant's contention is thus moot.  Defendant counters that the record does not clearly indicate that the enhancement was stricken, and if it was, it should not appear on the abstract of judgment as "PS" for *punishment* struck; rather, it should *not* be listed on the abstract at all.

While the court's order striking the enhancement was unclear, we conclude that it was the court's intention to do so.  Initially, the trial court sentenced defendant on count 3 to the high term of seven years plus the 20-year enhancement under section 12022.53, subdivision (c) for a total of 27 years.  After pronouncing sentence on the other counts, the trial court stated: "The court misspoke in the sentence of [defendant].  The 12022.53 C enhancement and the 12022.53 D enhancement cannot both be imposed.  So the total sentence is seven years on count 3 and in the indeterminant sentence, it's life, plus 25 to life.  So it's seven years, plus life, plus 25 to life.  But I can also say life the plus 25 to life on the 12022.53 D enhancement.  They both involvement [*sic*] the same thing, use of guns."  The reporter's transcript

26

ended there, with a notation that there was then a discussion off the record and that the proceedings concluded.

It appears that when the trial court said that it could not impose both the section 12022.53, subdivision (c) and (d) enhancements, it meant that it could not impose either of them, as the clerk's minutes of the sentencing hearing shows that the subdivision (c) enhancement was stricken and makes no mention of the subdivision (d) enhancement. On pages 2 and 3 of the minutes it is stated that as to count 3 the court ordered defendant to serve seven years in any state prison, that the court selected the upper term of seven years as to count 3, and "[a]s to the base term count 3: serve 7 years." On page 4, the minutes state: "The court strikes the PC 12022.53(c) enhancement as to count 3. [¶] Total sentence imposed in count 3 is 7 years."

In our prior opinion we ordered a modification of the abstract of judgment to reflect that the enhancement was stricken. We ordered the trial court to correct the abstract that the sentence on count 1 was life in prison plus 25 years to life for the firearm enhancement.[11] We describe the modification of the original abstract of judgment as it might be useful in avoiding such errors upon resentencing. We do not purport to suggest to the trial court how defendant should be resentenced.

IV. **Discretion to strike or impose a lesser firearm enhancement**

Defendant requested the trial court to exercise its discretion to strike the firearm enhancement found true as to counts 1 (and 3) under section 12022.53, subdivision (h) and section 1385, which gives the sentencing court the discretion to

---

[11]     See footnote 3, *ante*.

27

strike or dismiss firearm enhancements. The trial court denied the motion, and defendant now contends that since it was unclear that the trial court understood it had discretion not only to strike the entire enhancement as to count 1, but also to impose a lesser included firearm enhancement, the matter should be remanded for the trial court to consider this discretion.

The only firearm enhancement in count 1 that was found true by the jury was that defendant personally and intentionally discharged a firearm, a handgun, which caused great bodily injury to Romero within the meaning of section 12022.53, subdivision (d). In our first opinion, we disagreed with *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), which held that section 12022.53, subdivision (h) allows a trial court to exercise discretion to impose an uncharged lesser included enhancement in the interests of justice pursuant to section 1385. (*Morrison*, at pp. 222-223.) We declined defendant's request for remand on this ground. The California Supreme Court recently agreed with *Morrison* in *Tirado, supra*, 12 Cal.5th 688, overruling the appellate court that had disagreed with *Morrison*. In doing so, the court resolved a split in the Courts of Appeal on the issue. (*Tirado, supra*, at pp. 694-697.)

The People agree that the case must be remanded for resentencing in light of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) and Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill 81), and that under the full resentencing rule, the court may also revisit the firearm enhancement.[12]

---

[12] The People do not agree that the matter should be remanded for the trial court to consider discretion discussed in *Tirado*, noting that *Morrison* was published on April 11, 2019, and defendant was sentenced more than one month later, on

28

## V. Senate Bill 567

Defendant also seeks remand for resentencing under Senate Bill 567, which became effective on January 1, 2022, and applies retroactively to nonfinal judgments. (*People v. Garcia* (2022) 76 Cal.App.5th 887, 902.)[13]

---

May 22, 2019. The first published decision to disagree with *Morrison* was the Court of Appeal decision underlying *Tirado*, *supra*, 12 Cal.5th 688, prompting the prosecution to assert that the trial court must therefore have been aware of its discretion to impose an uncharged lesser included enhancement as an alternative to an outright denial of defendant's request to strike the enhancement altogether, and we must presume that the court appropriately chose not the exercise that discretion.

[13] The legislation amended the determinate sentencing law, which affects the trial court's discretion and authority to impose one of three statutory terms of imprisonment, known as the low, middle, and upper terms.

Section 1170, subdivision (b)(1) now provides: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph[ ](2)." Section 1170, subdivision (b)(2) provides in part: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

Section 1170, subdivision (b)(6)(A) and (B) provides in part: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating

The statute now requires the trial court to "set forth on the record the facts and reasons for choosing the sentence imposed[, and the] court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b)(5).)

It is not clear what aggravating circumstances were considered or how they were weighed in the trial court. At the sentencing hearing after arguments of counsel, the court commented: "I must admit that the court was struck by the disparity between the fact that the defendant has no prior record and the level of violence that's involved in this case."[14]

The trial court explained its determinate sentencing choices as follows:

> "I think it's entirely appropriate that the gang
> allegation was found to be not true. [¶] Nonetheless,
> he is a member of a gang. The gun was stored in this
> drain pipe opening or whatever it was for

circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma . . . . [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." A "youth" as defined in subdivision (b) of section 1016.7 "includes any person under 26 years of age on the date the offense was committed."

[14] The prosecutor had pointed out that defendant had shot an unarmed person in the face, just before the trial court made this statement. The People infer that the court apparently relied on the circumstance in aggravation that the crime involved great violence. (Cal. Rules of Court, rule 4.421(a)(1).)

30

accessibility outside of the house. He did leave and he returned.  Even if he had a fear that this Beto might be present, when he returned, Beto was not present.  There was no longer any basis for fearing that there might be armed retaliation by someone else who was not present.  At that point he shot one person in the face and then there were additional shots thereafter while they were fleeing.  [¶]  The court had initially considered seriously [the defense] request of exercising its discretion to strike the term of the enhancement on the gun use allegation, but under the total circumstances of the case, I feel that's inappropriate.  [¶]  The court is going to select the count 3 as the principal term and sentence the defendant to [the high term of] seven years."

We find remand is appropriate to give the trial court the opportunity to resentence defendant in light of changes effected by Senate Bill 567.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"].)

## VI.  Senate Bill 81

The People also agree with defendant that at resentencing the trial court must apply Senate Bill 81, which amended section 1385, effective January 1, 2022.  (Stats. 2021, ch. 721, § 1.)  We agree.  The amended statute expressly applies to sentencings occurring after its effective date.  (§ 1385, subd. (c)(7).)  Section 1385 now specifies "factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice."  (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

31

## VII. Section 1109

Defendant contends that the recently added section 1109 applies retroactively, requiring a reversal of his conviction of attempted murder (count 1) and remand for retrial. Defendant relies on *People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*), in which the majority held that section 1109 was retroactive because "the California Supreme Court has clarified the scope of the *Estrada* rule, expressly holding that a new statute may apply retroactively even if it concerns purely procedural changes that do not directly reduce the punishment for a crime." (*Burgos, supra*, at p. 565.)[15] The "*Estrada* rule" is "a limited rule of retroactivity that applies to newly enacted criminal statutes intended to reduce punishment for a class of offenders." (*People v. Buycks, supra*, 5 Cal.5th at p. 881, citing *Estrada, supra*, 63 Cal.2d at p. 745; see *Estrada*, at p. 883, fn. 8; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308 (*Lara*).) Otherwise, "No part of [the Penal Code] is retroactive, unless expressly so declared." (§ 3.)

As Justice Elia pointed out in his dissent in *Burgos*, neither *Estrada*, *Lara*, nor "any other [authority] has ever applied the *Estrada* rule to a statute, like section 1109, that does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or a defense. Section 1109, unlike all of the amendatory statutes to which the

---

[15] Defendant also claims that authority for this contention is found in *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087, which held: "Assembly Bill 333's amendments *to section 186.22* . . apply retroactively . . . ." (Italics added.) The opinion does not discuss section 1109 other than to mention that it was added by Assembly Bill No. 333 (2021-2022 Reg. Sess.).

*Estrada* rule has been applied, is a prophylactic rule of criminal procedure expressly intended to employ new procedures aimed at enhancing the fairness of future criminal proceedings." (*Burgos, supra*, 77 Cal.App.5th at p. 572 (dis. opn. of Elia, J.).)

Similarly, as stated in *People v. Perez* (2022) 78 Cal.App.5th 192: A new law that directly, indirectly or potentially ameliorates punishment may be applied retroactively, but section 1109 does not directly, indirectly or potentially ameliorate punishment; instead it "is a procedural statute that ensures a jury will not be prejudiced by the introduction of evidence to support gang enhancement allegations . . . ." (*Id.* at p. 207.)

As section 1109 does not expressly declare itself retroactive, we agree with *Perez* and with the *Burgos* dissent that section 1109 is not retroactive. (*People v. Perez, supra*, 78 Cal.App.5th at p. 207; *Burgos, supra*, 77 Cal.App.5th at p. 569 (dis. opn. of Elia, J.).)

**VIII. Assembly Bill No. 177**

Defendant contends that when the trial court sentenced him in 2019 and ordered him to pay a $500 restitution fine, additional fees were imposed pursuant to section 1202.4, former subdivision (*l*) and section 2085.5, former subdivision (e), provisions which authorized collecting authorities to impose administrative and collection fees of up to 10 percent of the fine.[16] Defendant concludes, "Following the implementation of Assembly Bill 177, the fees must be reconsidered." Assembly Bill No. 177

---

[16] Defendant cited only to that page of the record where the restitution fine was imposed. We have found no imposition of administrative fees in the sentencing transcript. Respondent represents that no such fees were assessed by the trial court.

(2021-2022 Reg. Sess.) (Assembly Bill 177) eliminated those provisions. The trial court may no longer impose administrative fees related to collection of restitution fines. (Stats. 2021, ch. 257, §§ 19-20, 36, (2021-2022 Reg. Sess.).)

As the People observe, Assembly Bill 177 also amended section 1465.9, subdivision (b) to read: "On and after January 1, 2022 the balance of any court-imposed costs pursuant to Section 1001.15, 1001.16, 1001.90, 1202.4, 1203.1, 1203.1ab, 1203.1c, 1203.1m, 1203.4a, 1203.9, 1205, 1214.5, 2085.5, 2085.6, or 2085.7, as those sections read on December 31, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2021, ch. 257, § 35.)

Thus, if any such fees were assessed against defendant, they are unenforceable, and if defendant identifies any such fees, he may have them vacated.

### DISPOSITION

The judgment of conviction is affirmed. The sentence is vacated, and the matter is remanded for a new sentencing hearing, guided by the newly enacted laws discussed in this opinion.

_____
CHAVEZ, J.

We concur:

_____          _____
LUI, P. J.                       HOFFSTADT, J.

34